**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

UNITED STATES OF AMERICA

    Plaintiff

       v.

(1) RENE VAZQUEZ-BOTET,

(2) MARCOS MORELL-CORRADA

    Defendants

CR. NO. 04-160 (PG)

## OPINION & ORDER

Before the Court are the government's motions to recuse and to stay (Docket Nos. 197, 198 and 200). For the reasons set forth herein, the government's motions are **DENIED**. This Court will remain presiding over this case, and its investigation into possible violations of Fed.R.Crim.P. 6(d) and (e) shall proceed as detailed in Section V(H) of this opinion.

### I. BACKGROUND

On June 1, 2004, defendant Vazquez-Botet filed an ex-parte sealed motion alleging irregularities in the grand jury process and requesting an investigation. (Docket No. 35). Vazquez-Botet appended an anonymous letter from a person purporting to be a grand jury member and claiming troubling irregularities in the grand jury proceedings. Following that motion, the Court authorized limited disclosures of ministerial grand jury records. On November 9, 2004, the Court referred the matter to Chief Magistrate Judge Justo Arenas to conduct interviews with the grand jurors regarding the alleged irregularities (Docket No. 109), the results of which were made available to the parties during the March 14, 2005 Status Conference (Docket No. 159). Defendants coextensively moved for an expert examination of the grand jury room to determine whether grand jury secrecy could have been pierced by government agents in a position to overhear the grand jurors' conversations. (Docket No. 133). On February 3 and March

21, 2005, the Court issued Orders initiating such an expert investigation, and on June 29, 2005, acoustical expert Dr. Jorge Rocafort submitted his sealed report. Again, the Court made Dr. Rocafort's report available to the parties via Sealed Order. (Docket No. 184). Upon disclosure of Chief Magistrate Judge Arenas' Report, defendants moved for further investigation of grand jury proceedings (Docket Nos. 164 and 167), which the government opposed for the first time. (Docket No. 178).[1] On August 2, 2005, defendant Vazquez-Botet filed a sealed motion submitting a sworn statement from former Assistant United States Attorney Joseph Frattallone-Marti with which he sought to buttress the defense's request for continued investigation into the possible rupture of grand jury secrecy. (Docket No. 182). Defense counsel notified and sent a copy of this motion to the government. On August 30, 2005, the Court issued an unsealed Order continuing the trial *sine die* pending conclusion of its investigation, and excluding the duration of the investigation from the provisions of the Speedy Trial Act.[2] (Docket No. 195). On October 3, 2005, the government moved, through sealed and unsealed versions of its motions, for the Court's recusal, and for stay and termination of the investigation (Docket Nos. 197, 198 and 200).[3] Defendants jointly opposed the government's

---

[1] This opposition to the defendants' motion is the first and only sign of displeasure from the government on the record, and the last one prior to the recusal motion now before the Court.

[2] Contrary to the governments contentions, though referring to "troubling allegations regarding the above styled and captioned case", the Court made no mention of the nature or scope of its investigation in its August 30, 2005 Order to avoid any potential prejudice to either party. Nor did the Court accuse either party of being the culprit of the allegations that prompted the Court's investigation.

[3] The Court will not speculate as to the government's motives for filing an unsealed version of its motion. However, given the motion's inextricable relation to the Court's investigation of potential grand jury violations, by filing an unsealed version the government violated Local Rule 106(b). Rule 106(b) provides that "[a]ll subpoenas, **motions**, **pleadings**, and other documents...concerning or contesting grand jury

request (Docket No. 206), and the government replied.   (Docket No. 211).

## II. **THE GOVERNMENT'S RECUSAL MOTION**

Though by no means controlling, it is illustrative that the government's motion is practically devoid of legal citations.   That this is so, however, is not surprising, as this Circuit (or any other) has never required recusal of a judge based on nothing more than innuendo and conjecture.[4]   Stripped of its rhetorical gloss, In re United States, 158 F.3d at 31, the government's recusal motion rests on the following feeble grounds:

> 1. That the Court engaged in a secret investigation into potential government misconduct without legal or factual bases to do so;
>
> 2. That some of the Court's rulings in the case of U.S. v. Rivera-Rangel, Cr. No. 02-98 (PG), and their subsequent reversal by the First Circuit establish the appearance of partiality and warrant recusal; and
>
> 3. That the Court has impermissibly injected its alleged political affiliation into the proceedings, and that this political affiliation has motivated its investigation.

Following, the Court discusses the applicable standard, the timeliness of

---

proceedings **shall be sealed unless otherwise ordered by the Court."** L.Crim.R. 106(b) (emphasis provided).   The Court reminded the parties of their required compliance with Local Rule 106(b) in its August 2, 2005 Order (Docket No. 184), a fact that underscores the government's infringement.

[4] The Government, through its word choice, misleading citations, and other instances of questionable ethical judgment, has also attempted to incite the Court's ire so as to cement an otherwise baseless motion for recusal.   However, the Court will not dwell on the Department of Justice high echelon's decision to sign a motion riddled with pejorative and highly charged language.     Their word choice speaks volumes for itself. Nonetheless, given its ethical implications, the Court is more troubled by the Public Integrity Section's endorsement of a motion that contains numerous misrepresentations of fact and law, and more alarming, was filed in unsealed form in clear violation of Local Rule 106(b).

the government's motion, and lastly, considers each of the government's grounds in turn.[5]

## III. RECUSAL STANDARD

It is well settled that section 455(a) motions customarily are decided by the judge whom the movant seeks to disqualify, a fact neither party challenges. See In re Martinez-Catala, 129 F.3d 213, 220 (1st Cir. 1997) (holding that to the extent facts relevant to the recusal determination are in dispute, "factual determinations are made by the judge whose recusal is in question, and the same judge also decides whether the facts trigger disqualification."). It is significant to note from the outset the narrowness of the government's position: it does not contend that this Court has any actual bias or prejudice which would require recusal under 28 U.S.C. § 144 (1994). It likewise eschews the mandatory bases for disqualification listed in 28 U.S.C. § 455(b) (1994).[6] Instead, the government premises its recusal motion exclusively on 28 U.S.C. § 455(a) (1994), which provides that "[a]ny justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned."

The Court begins, as it must, with the statute. Section 455(a) "stands at a crossroads between competing policy considerations." In re United States, 158 F.3d 26, 30 (1st Cir. 1998). On the one hand, the statute forbids "not only the reality of partiality, but its objective

---

[5] Because several issues and arguments raised by the government bleed into more than one section, the Court will discuss them wherever they are relevant, even at the expense of some redundancy.

[6] As defendants correctly point out, the government has made several vague references to actual bias (See Gov't Mot. at 2, Docket No. 200). However, throughout its motion, the government abandons this line both through its arguments and through its obvious non-compliance with the procedural requirements of 28 U.S.C. §§ 144 and 455(b). Consequently, the Court will consider the government's motion strictly as one under § 455(a).

appearance as well." Liteky v. United States, 510 U.S. 540, 548 (1994).
On the other hand, recusal on demand "would put too large a club in the
hands of litigants and lawyers", granting them a veto power over unwanted
judges. In re United States, 158 F.3d at 30. Consequently, it has become
axiomatic that judges are not to recuse themselves lightly under section
455(a). See H.R. Rep. No. 93-1453, at 5 (1974), reprinted in 1974
U.S.C.C.A.N. 6351, 6355 ("[Section 455(a)] should not be used by judges
to avoid sitting on difficult or controversial cases."). Though doubts
ordinarily ought to be resolved in favor of recusal, In re United States,
158 F.3d at 30, a Supreme Court Justice has noted that "a high threshold
is required to satisfy th[e recusal] standard." Liteky, 510 U.S. at 557-
558 (Kennedy, J., concurring in the judgment). See In re United States,
158 F.3d at 34 (citing Justice Kennedy's Liteky concurrence for the high
threshold proposition). See also Camacho v. Autoridad de Telefonos de
Puerto Rico, 868 F.2d 482, 491 (1st Cir. 1989) (noting that the judicial
system would be "paralyzed" were recusal standards too low). Thus, under
§ 455(a) a judge has a duty to recuse himself if his impartiality can
reasonably be questioned; but otherwise, he has a duty to sit.[7]  A more
lenient approach "would transform recusal motions into tactical weapons
which prosecutors and private lawyers alike could trigger by manipulating
the gossamer strands of speculation and surmise." In re United States,
158 F.3d at 35.

For these reasons, section 455(a) requires a judge to step down "only
if the charge against her is supported by a factual foundation and the
facts provide what an objective, knowledgeable member of the public would

---

[7] While section 455(a) modified the duty to sit doctrine to require
that judges resolve close cases in favor of recusal, it did not eliminate
it.  See In re Martinez-Catala, 129 F.3d at 221.  Thus, in the sense "that
judges hear cases unless there is some reason not to, the 'duty to sit'
remains."  United States v. Snyder, 235 F.3d 42, 46 n. 1 (1st Cir. 2000)
(citing Blizard v. Frechette, 601 F.2d 1217, 1221 (1st Cir. 1979)).

find to be a *reasonable basis* for doubting the judge's impartiality." Id. at 30 (internal citations omitted) (emphasis in original). See also Comfort v. Lynn School Committee, 418 F.3d 1, 26 (1st Cir. 2005) (stating and applying same recusal standard). In our Circuit, a knowledgeable person under section 455(a) is one "fully informed of all the facts." In re United States, 158 F.3d at 31. See also Cheney v. U.S. District Court for the District of Columbia, 124 S.Ct. 1391, 1400 (2004) (Scalia, J., sitting as single Justice) ("It is well established that the recusal inquiry must be made from the perspective of a *reasonable* observer who is *informed of all the surrounding facts and circumstances*") (emphasis in original) (internal citations omitted). Furthermore, a judge "is not compelled automatically to accept as true the allegations made by the party seeking recusal." In re Martinez-Catala, 129 F.3d at 220. Instead, the factual foundation must be anchored on "facts proven", not on "unverified suspicions harbored by the government or the innuendo interspersed throughout...its recusal motion." In re United States, 158 F.3d at 31.

Additionally, the factual basis for a recusal motion generally must stem from an extra-judicial source. Liteky, 510 U.S. at 555. After Liteky, it is axiomatic that the extrajudicial source limitation "should govern for purposes of § 455(a)." Id. at 553. Though described as a doctrine "more standard in its formulation than clear in its application," Id. at 544, the extrinsic source limitation is "the only *common* basis" for establishing disqualifying bias or prejudice. Id. at 551. This limitation to section 455(a) requires that the alleged bias or prejudice "must derive from something other than that which the judge learned by participating in the case." Jaffe v. Grant, 793 F.2d 1182, 1189 (11th Cir. 1986). Even though the Supreme Court has noted that the extrajudicial source limitation is not the exclusive reason a predisposition can be wrongful

or inappropriate, the only exception to it that has emerged from the recusal jurisprudence is the so-called "pervasive bias" exception. Liteky, 510 U.S. at 551.  Thus, Justice Kennedy has noted that "under § 455(a), a judge should be disqualified only if it appears that he or she harbors an aversion, hostility or disposition of a kind that a fair-minded person could not set aside when judging the dispute", a formulation the First Circuit has adopted as its own.  See In re United States, 158 F.3d at 34.  See also Guide to Judicial Policies and Procedures, Vol. 2 Advisory Op. No. 66, IC-149 (1999) (stating that § 455(a) is not implicated unless the conduct reflects "deep seated favoritism or antagonism that would make fair judgment impossible); United States v. Berger, 375 F.3d 1223, 1227 (11th Cir. 2004) (holding that absent a showing of "pervasive bias and prejudice," a § 455(a) motion must "stem from extrajudicial sources.") (internal citations omitted).

## IV. TIMELINESS OF THE GOVERNMENT'S MOTION

The government filed its recusal motion on October 3, 2005.  As is intimated above and described in more detail in the sections that follow, the government's motion relies primarily on the following: (a) the Court's investigation into potential grand jury secrecy violations; and (b) the alleged appearance of partiality created by the Court's reversed rulings in the unrelated matter of United States v. Ramirez-Rangel, and the Court's political affiliation as purportedly expressed during meetings with FBI Special-Agent-in-Charge Luis Fraticelli.

When confronted with a recusal motion pursuant to § 455(a), a "court's inquiry into the timeliness of the government's motion" is a "proper subject for scrutiny." In re United States, 158 F.3d at 34.  In fact, contrary to the government's suggestions that partiality allegations under § 455(a) are not subject to dismissal for untimeliness (Gov't Reply at 7, Docket No. 211), it is well settled that "while section 455(a)

contains no express timeliness provision, most circuits considering the matter have concluded that a litigant must raise the disqualification issue within a reasonable time after the grounds for it are known." United States v. Barrett, 111 F.3d 947, 951 (D.C. Cir. 1997). See also El Fenix de Puerto Rico v. The M/Y Johanny, 36 F.3d 136, 141 n. 6 (1st Cir. 1994) (noting that the section 455(a) recusal motion before them "may have been rendered infirm by the delay in filing."); United States v. Slay, 714 F.2d 1093, 1094 (11th Cir. 1983) (holding that timeliness is a component of section 455(a)). Thus, a party must bring a recusal motion under section 455(a) at the earliest moment after knowledge of the facts demonstrating the basis for such disqualification. United States v. Kelly, 519 F.Supp. 1029, 1047-1050 (D. Mass. 1981). See also Apple v. Jewish Hosp., 829 F.2d 326, 333 (2d Cir. 1987) (holding that a party must bring a recusal motion "at the earliest possible moment after obtaining knowledge of the facts demonstrating the basis for such a claim."); Slay, 714 F.2d at 1094 (holding that defendant's recusal motion was untimely because counsel was aware of the facts which allegedly supported his motion to disqualify before the hearing). Exempting section 455(a) from a timeliness requirement "would encourage parties to withhold recusal motions pending a resolution", thereby allowing parties to sandbag the Court if dissatisfied with its rulings. Fenix de Puerto Rico, 36 F.3d at 141 n. 6 (citing E. & J. Gallo Winery v. Gallo Cattle Co., 967 F.2d 1280, 1295 (9th Cir. 1992)).

The instant case has been active before this Court since April 8, 2004. As detailed in section I, *supra*, the Court has been investigating serious and troubling allegations of potential grand jury secrecy violations since early June, 2004. Throughout this investigation, the Court regularly appraised both the defense and the government of its progress, and consistently disclosed relevant documents to both parties

as they became available. This flow of information notwithstanding, the government first saw fit to oppose the continuation of the investigation on July 20, 2005, at which point it did not seek the Court's recusal. (Docket No. 178).   In this context, even assuming *arguendo* that the government's complaints about the Court's investigation are proper grounds for recusal, its argument that recusal is warranted because the Court lacked a legal basis to conduct its investigation   (Gov't Mot. at 1, Docket No. 200) is untimely. If in fact the government believes the Court should step aside because it has conducted an investigation without authority or legal basis to do so, it should have moved for recusal as soon as the Court initiated such an investigation, or at least in its opposition to the defense motion for continued investigation.

Also, the government's argument that the Court's meetings with and alleged statements to SAC Fraticelli require recusal is likewise untimely. The government did not seek an affidavit from SAC Fraticelli until September 29, 2005. However, the two meetings Fraticelli recounts in his affidavit occurred during June 2004.    Furthermore, the government acknowledges that the Court notified the parties during a June 2004 *in camera* status conference that it "believed the FBI and the PR-USAO were responsible" for the leaks.    (Gov't Mot. at 5, Docket No. 200). Notwithstanding, the government did not seek the Court's recusal between June 2004 and October 2005, a 16 month period during which it filed numerous motions with the Court. Since the government was well aware of the Court's concerns, of its suspicion pointing to the FBI and PR-USAO, and of the meetings with SAC Fraticelli, but chose not to move for recusal until 16 months later, the Court cannot but conclude that, displeased with the Court's rulings, the government has chosen to wield its recusal motion as a tactical weapon against this court in hopes of being heard by a

different judicial officer more to its liking.[8]

Finally, the government's reliance on this Court's rulings in the *Rivera-Rangel* case and the First Circuit's reversal of those rulings is equally and fatally dilatory. The Court's relevant opinion and orders in the *Rivera-Rangel* case were entered on September 9, 2003 and May 19, 2004. (Cr. No. 02-98, Docket Nos. 131 and 149). The First Circuit reversed these opinion and orders via published opinion on February 8, 2005, and on March 23, 2005 denied rehearing *en banc*. United States v. Ramirez-Rangel, 396 F.3d 476 (1st Cir. 2005). Though, as mentioned above, the present case has been active before this Court since April 8, 2004, the government did not seek recusal within a reasonable period following the First Circuit's decision in *Rivera-Rangel*. Instead, it again waited for a more convenient and strategically opportune moment to move for the Court's disqualification, a practice clearly and resoundingly rejected by the overwhelming weight of precedent.

Undaunted by the weight of adverse case law and facts, the government argues for the application of a "tipping point" timeliness standard, a test heretofore unrecognized by the First Circuit, or any other Circuit to have addressed the matter.[9] (Gov't Reply at 7, Docket No. 211). The

---

[8] It is relevant to note that, as early as April 15, 2004, the defense ominously warned that the government was attempting to "take this case away from Judge Perez-Gimenez without directly moving for his recusal" by misleadingly moving Chief Judge Jose A. Fuste to transfer the case to his docket and consolidate it with one of his cases. (Docket No. 19 at 2). This failed attempt violated Local Rule 3.2, which places the initial transfer decision on the judge to whom the case was originally assigned, and, when granted, requires the consent of the receiving judge to complete the transfer and consolidation. However, in the instant case the government requested the receiving judge (Chief Judge Fuste) to order the transfer instead of first asking the judge to whom the case was originally assigned (this Court) to do so.

[9] In fact, the government does not cite any authority for the so-called "tipping point" standard, and the Court's research has not uncovered any, either.

Court finds no reason to deviate from the well-settled precedent that grounds for recusal must be raised as soon as the party seeking disqualification becomes aware of them. Instead of requesting recusal as soon as it became aware of the facts that allegedly require it, the government chose to sit on these facts in the hopes of having ammunition against the Court if and when the government was unhappy with its rulings. Consequently, the Government's motion for recusal should be denied as untimely. However, in the interest of thoroughness, the Court will next address each of the government's arguments for recusal, a road that, though longer, in the end leads to the same conclusion: that the government's motions for recusal and stay must be denied.

## V. THE COURT'S INVESTIGATION

The government's main argument in favor of recusal is cemented on the proposition that "the Court is no longer acting as an impartial judicial officer, but instead has taken on the role of an inquisitor/prosecutor by conducting an on-going and secret investigation of the government." (Gov't Mot. at 1, Docket No. 200). As is obvious from the government's own formulation of their argument, it seeks recusal based on its dissatisfaction with how the Court has shepherded this case in general, and the investigation into potential grand jury secrecy violations in particular.  However, "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion...Almost invariably they are proper grounds for appeal, not for recusal." Liteky, 51 U.S. at 555. This "may be true even when the judicial rulings in question are erroneous." In re Boston's Children First, 244 F.3d 164, 167, n. 7 (1st Cir. 2001). Thus, like most of the grounds and arguments advanced by the government, its complaints about the ongoing investigation into potential grand jury secrecy violations are nothing more than signs of displeasure with the Court's judicial rulings. However, instead of appealing, the government now seeks

a judge more to its liking.  Nonetheless, the Court now turns to the merits of the government's recusal motion so as not to leave any stone unturned.

## A. The Institution of the Grand Jury

The grand jury is deeply rooted in long centuries of Anglo-American legal history. Though not mentioned in the body of the Constitution, the Founding Fathers "thought [it] so essential to basic liberties that they provided in the Fifth Amendment that federal prosecution for serious crimes can only be instituted by a presentment or indictment of a grand jury." United States v. Calandra, 414 U.S. 338, 343 (1974).  That it "has not been textually assigned to any of the branches described in the first three Articles", U.S. v. Williams, 504 U.S. 36, 47 (1992), underscores the fact that the grand jury is a "constitutional fixture in its own right." Williams, 504 U.S. at 47 (quoting U.S. v. Chanen, 549 F.2d 1306, 1312 (9th Cir. 1977)).   In fact, the historic theory behind the grand jury's function is that "it belongs to no branch of the institutional Government, serving as a kind of buffer or referee between the Government and the people."  504 U.S. at 47.  These historic functions survive to this day, as its responsibilities "continue to include both the determination whether there is probable cause to believe a crime has been committed and the protection of citizens against unfounded criminal prosecutions." Calandra, 414 U.S. at 343.  This dual role as investigator and protector has garnered descriptions of the grand jury as both a sword and a shield.

## B. The Court's General Supervisory Power Over Grand Jury Proceedings

Recognizing the tradition of independence underlying the grand jury, the Supreme Court has said that the "Fifth Amendment's constitutional guarantee presupposes an investigative body acting independently of either prosecuting attorney or judge." United States v. Dionisio, 410 U.S. 1, 16 (1973) (quoting Stirone v. United States, 361 U.S. 212, 218 (1960)). However, the grand jury "is not an autonomous body completely beyond the

reach of other branches." Williams, 504 U.S. at 66 (Stevens, J., dissenting). The Supreme Court has held that though "a grand jury is clothed with great independence in many areas...it remains an appendage of the court." Brown v. United States, 359 U.S. 41, 49 (1959).

In this context, it is the courts' duty to ensure that grand juries perform their functions aptly and justly, so that they might serve "the invaluable function in our society of standing between the accuser and the accused...to determine whether a charge is founded upon reason or was dictated by an intimidating power or malice and personal ill will." Wood v. Georgia, 370 U.S. 375, 390 (1962). To these ends, courts "retain general supervisory power over the grand jury to prevent abuse of its process or the invasion of the constitutionally protected rights of the witnesses called before it." In re Maury Santiago, 533 F.2d 727, 731 (1st Cir. 1976). These supervisory powers, though more limited than those over the petit jury, are nonetheless essential tools courts can and must wield to ensure the legality, fairness, and impartiality of grand jury proceedings. See U.S. v. Vetere, 663 F.Supp. 381, 386 (S.D.N.Y. 1987) (holding that "the exercise of the court's supervisory power can extend beyond the minimum requirements set by the Constitution to encourage fair and uniform procedures in the prosecution of criminal cases.").

Significantly, federal courts may exercise their supervisory powers over grand juries to remedy violations of recognized rights, to protect the integrity of the federal courts, and to deter illegal conduct by government officials. United States v. DiBernardo, 775 F.2d 1470 (11th Cir. 1985), *cert. denied* 476 U.S. 1105 (1985). For example, courts have often resorted to their inherent supervisory power to deal with and remedy prosecutorial misconduct before the grand jury. The Fourth Circuit has held that a district court's supervisory power over grand jury proceedings is sufficient for it, upon proper proof, to impose civil or criminal

contempt sanctions for violation of grand jury secrecy rules "because its inherent powers are not proscribed by Rule 6." Finn v. Schiller, 72 F.3d 1182, 1191 (4th Cir. 1996). The remedies fashioned by courts pursuant to their inherent supervisory power over grand jury proceedings range from recommending disciplinary action against a prosecutor found to have engaged in misconduct before the grand jury in violation of the law or Department of Justice policies and guidelines, to imposition of civil or criminal contempt sanctions, to more severe remedies like suppression of grand jury testimony, and, in last resort and upon a showing of prejudice, dismissal of the indictment. See U.S. v. Pacheco Ortiz, 889 F.2d 301, 309 (imposing the severe sanction of suppressing grand jury testimony "for the failure to follow Justice Department policy"); Schiller, 72 F.3d at 1190 (holding that a district court's supervisory power over grand jury proceedings is sufficient for it, upon proper proof, to impose civil or criminal contempt sanctions for violation of grand jury secrecy rules); Bank of Nova Scotia v. United States, 487 U.S. 250 (1988) (holding that a district court may not dismiss an indictment for errors in grand jury proceedings unless such errors prejudice the defendants).

*C. The Court's Power to Investigate and Remedy Violations of Rules 6(d) and 6(e) of the Federal Rules of Criminal Procedure*

Among the grand jury's most significant attributes, both historical and practical, is the secrecy of its processes and deliberations. Indeed, the Supreme Court has consistently "recognized that the proper functioning of our grand jury system depends upon the secrecy of grand jury proceedings." Douglas Oil Co. v. Petrol Stops Northwest, 441 U.S. 211, 218 (1979); United States v. Proctor & Gamble Co., 356 U.S. 677 (1958). Preserving the confidentiality of the grand jury protects several important interests of the government and of private citizens. First, if pre-indictment proceedings were public, individuals who learned of their

possible indictment might flee the jurisdiction or attempt to tamper with the grand jurors or witnesses appearing before them.     Persons with information about crimes would be less willing to appear voluntarily and to speak fully and frankly, knowing that the individuals about whom they testify would be aware of that testimony.   The rule of secrecy avoids injury to the reputation of those persons accused of crimes whom the grand jury does not indict.     Finally, it encourages the grand jurors to investigate suspected crimes without inhibition and to engage in unrestricted deliberations.     See Douglas Oil Co. v. Petrol Stops Northwest, 441 U.S. at 219; United States v. Proctor and Gamble Co., 356 U.S. at 681 n.6; United States v. Malatesta, 583 F.2d 748, 752 (5th Cir. 1978), modified on other grounds, 590 F.2d 1379 (en banc), cert. denied, 440 U.S. 962 (1979). Beyond jurisprudential recognition and enforcement, the Federal Rules of Criminal Procedure embody these policies and expressly protect grand jury secrecy, specifically through Rules 6(d) and 6(e).  Additionally, this Court has supplemented the protections of Rule 6(d) through its Local Criminal Rule 106(c).

Under the caption of "Who May be Present," Federal Rule of Criminal Procedure 6(d)(2) states that "[n]o person other than the jurors, and any interpreter needed to assist a hearing-impaired or speech-impaired juror, may be present while the grand jury is deliberating or voting." The Rule "protects against the danger that a defendant will be required to defend against a charge for which there is no probable cause to believe him guilty." United States v. Mechanik, 475 U.S. 66, 70. Additionally, the Rule "is designed to guard the secrecy of the grand jury proceedings, prevent intimidation of jurors, and guarantee that the grand jury is given an opportunity to make an independent examination of the evidence..." Mechanik, 475 U.S. at 74 (O'Connor, J., concurring in the judgment).  As a supplement to Rule 6(d), this District has enacted Local Rule 106( c),

which reads as follows:

> When the grand jury is in session, the area surrounding the grand jury room shall be secured, and **no one** shall be permitted to wander about, sit in the corridors, or otherwise attempt to ascertain the identity of witnesses or members of the grand jury. (emphasis added).

With the same secrecy policies as guiding beacons, Rule 6(e) permits matters occurring before a grand jury to be disclosed to an attorney for the government and any government personnel necessary to assist him or her to enforce federal criminal law. See Fed. R. Crim. P. 6(e)(2) and 6(e)(3)(A)(ii). Rule 6(e)(2) prohibits those individuals from disclosing "matters occurring before the grand jury" except as otherwise authorized by the Rule. See id. Courts have construed the phrase "matters occurring before the grand jury" to include any item that might reveal what occurred before the grand jury. See In re: Grand Jury Investigation (Lance), 610 F.2d 202, 216-17 (5th Cir. 1980). There is general agreement that Rule 6(e) does not protect only the transcript or the minutes of the grand jury proceedings, but also any information that would reveal the identities of the grand jurors or witnesses, the substance of testimony, the strategy or direction of the investigation, the grand jurors' deliberations or questions, or any comparable matter. Id. Thus, Rule 6(e) applies "not only to events which have already occurred before the grand jury, such as witness's testimony, but also to disclosures of matters which will occur..." Id. at 217.

As has been mentioned before, it is among "the important responsibilities of a district judge to safeguard against unreasonableness and oppression" in the government's use of the grand jury. In re Grand Jury Matters, 751 F.2d 13, 19 (1st Cir. 1984). Indeed, presented with a prima facie showing of potential grand jury secrecy violations, "the court must take appropriate steps to determine whether a violation has occurred." Finn v. Schiller, 72 F.3d 1182, 1189 (4th Cir. 1996)(finding

that the court has a **duty** to protect the integrity of grand jury proceedings, and remanding the case to the district court with instructions that it investigate the grand jury secrecy violations) (emphasis added). See generally In re Grand Jury Porceedings, 814 F.2d 61, 71 (1st Cir. 1987) (noting that despite the "presumption of regularity" that clothes grand jury proceedings, neither the First Circuit nor other courts "have shirked the responsibility of deciding the merits of challenges to grand jury proceedings). Thus, in exercising their duty, "courts must not tolerate violations of Rule 6(e) [or Rule 6(d)] by anyone, especially United States Attorneys..." Finn, 72 F.3d at 1189.

Furthermore, the Court is empowered to impose contempt sanctions for past violations, see Fed.R.Crim.P. 6(e)(7), and to afford equitable relief to guarantee the secrecy and proper functioning of the grand jury in the future. See Barry v. United States, 865 F.2d 1317, 1321-22. In extreme cases where defendants can establish prejudice, even dismissal of the indictment may be appropriate. See Bank of Nova Scotia v. United States, 487 U.S. 250, 256 (1998) (O'Connor, J., concurring). Even though in Mechanik v. United States, 475 U.S. 66 (1986), the Supreme Court held that a petit jury verdict would render harmless any Rule 6(d) violation brought to the Court's attention after trial, the Court expressly left open the question of "what remedy may be appropriate for a violation of Rule 6(d) that has affected the grand jury's charging decision and is brought to the attention of the trial court before the commencement of trial." Mechanik, 475 U.S. at 72. Indeed, precisely because a petit jury's guilty verdict renders any grand jury violation harmless, dismissal of the indictment is the most appropriate remedy for gross violations of Rule 6, and has remained the presumptive remedy for violations of Rule 6(d). United States v. Echols, 542 F.2d 948, 951 (5th Cir. 1976), cert. denied 431 U.S. 904 (1977). See, e.g., United States v. Carper, 116 F.Supp. 817 (D.D.C.

1953) (dismissing indictment when three government agents admitted being present in the grand jury room while witnesses were testifying, even though they were not present when the jurors were deliberating or voting).

That the duty to investigate potential violations of Rules 6(d) and 6(e) is shouldered by the district court makes sense both in practical and policy terms. To place the duty on the government would be to tempt fate, leaving the fox to guard the chickens. See generally In re Pantojas 628 F.2d 701, 704-05 (1st Cir. 1980) (noting that "the practical responsibility for controlling grand jury excesses lies with the district court."). Furthermore, the Court's power and authority to investigate potential government breaches of grand jury secrecy is consistent with the Supreme Court's direction that:

> The courts must take such steps by rule and regulation that will protect their processes from prejudicial outside interferences. Neither prosecutors, counsel for defense, the accused, witnesses, court staff nor enforcement officers coming under the jurisdiction of the court should be permitted to frustrate this function.

Sheppard v. Maxwell, 384 U.S. 333, 363 (1966). For similar reasons, courts are endowed with considerable discretion in conducting investigations into possible grand jury secrecy violations. In re Sealed Case, 151 F.3d 1059, 1073 (D.C. Cir. 1998) (holding that "the district court should have sufficient leeway to establish procedures it believes will assist it best in discovering the truth of the matter while at the same time not causing undue interference with either the work of the grand jury or that of the district court itself.")

The Court's power to investigate and remedy violations of Rules 6(d) and 6(e) being clear, we now turn to the investigation and evidence presented in the instant case. As a threshold matter, the Court notes that the *prima facie* showing which sparks a court's duty to investigate potential grand jury secrecy violations amounts to "little more than a

showing of whatever is required to permit some inferential leap sufficient to reach a particular outcome." In re Grand Jury Proceedings, 417 F.3d 18, 22-23 (1st Cir. 2005) (also cataloguing *prima facie* "among the most rubbery of all legal phrases..."). In the specific context of Rule 6(e), the movant's burden is "relatively light" and the showing "need only be susceptible to an interpretation that the information reported was furnished by an attorney or agent of the government..." Barry v. United States, 65 F.2d 1317, 1325 (D.C. Cir. 1989). The Court agrees with defendants and holds that they have come forth with sufficient evidence to constitute a *prima facie* showing of violations of both Rule 6(d) and 6(e), thereby triggering the Court's duty to investigate and demolishing the government's contention that the Court's investigation constitutes a cognizable ground for recusal under 28 U.S.C. § 455(a).

## D. *Prima Facie Evidence of Rule 6(d) and Local Rule 106(c) Violations*

Federal Grand Jury No. 03-1 returned the indictment in the captioned case on April 8, 2004. However, another Grand Jury, No. 02-1, had been previously empaneled to receive evidence pertaining to the same case. On June 1, 2004, Defendant Vazquez-Botet filed a sealed *ex parte* motion, (Docket No. 35), to which he appended a letter addressed to defense counsel from an individual who identified himself as a former member of Grand Jury 02-1. In the letter, the purported former grand juror alleged that prosecutor Mary K. Butler had taken "the case away from us [Grand Jury 02-1] on February 24, 2004 upon learning that the vast majority of the grand jury had decided on a NO TRUE BILL." (Docket No. 35, Ex. 1). The author of the letter proposed that "[their] theory and what [they] suspect about this are [sic] that the area where the Grand Jury members have coffee they had a microphone and listened in on our conversations..." (Docket No. 35, Ex. 1).

After the Court's Order to disclose some of Grand Jury 02-1's

ministerial records to the defense, (Docket No. 109), defendants also learned that Grand Jury 02-1 had been empaneled on February 26, 2002, and received an extension on August 25, 2003. It expired without voting on February 24, 2004. During Grand Jury 02-1's 2-year life span, it met on the instant case twenty (20) times and heard a total of 73 hours worth of evidence. Despite the government's significant time investment in Grand Jury 02-1, and the fact that it had close to a month of its term left, the government stopped presenting evidence to Grand Jury 02-1 on January 30, 2004, and began presenting evidence to Grand Jury 03-1. In contrast to Grand Jury 02-1, 03-1 met only on 5 occasions during a five week period (four times in March, 2004 and a final time on April 8, 2004 when it returned the indictment) and heard evidence on this case for a total combined amount of 23 hours.[10]

Based on the former grand juror's allegations, defendants moved the Court to investigate, and the Court Ordered such an investigation on November 9, 2004. (Docket No. 109). The Court referred the matter to Chief Magistrate Judge Justo Arenas, and directed him to interview members of Grand Jury 02-1 *ex parte* and *in camera*. (Docket No. 109). Relying on the grand juror's letter in conjunction with the circumstantial evidence about the government's grand jury switch, defendants later argued that a *prima facie* showing had been made to support the conclusion that the government had been surreptitiously listening to Grand Jury 02-1's deliberations in contravention of Rule 6(d) and Local Rule 106( c), which in turn warranted further investigation. (Docket No. 131). Specifically, defendants claimed that the government had used Grand Jury 02-1 "as a

---

[10] Interestingly, the defense points out that during the same 5 week period that it heard evidence about this case, Grand Jury 03-1 returned indictments in at least 7 other cases, thereby casting further doubts on the quality and quantity of attention it could have paid the instant case. See Defs.' Resp. at 24 n.15, Docket No. 206.

'focus group'" before which prosecutors could surreptitiously gauge reactions to their presentation and later present only the well-received evidence to the indicting Grand Jury, 03-1. (Docket No. 131 at 2).

Meanwhile, Magistrate Judge Arenas interviewed the grand jurors during December 7, 28 and 30, 2004, reaching the ultimate conclusion that their testimony was "alone inconclusive" concerning "possible irregularities" in Grand Jury 02-1's proceedings. The Magistrate's report was made available to the parties on March 14, 2005. As a preliminary matter, the Court notes that, though a helpful initial step, Magistrate Judge Arenas' questions were general, concentrating on whether the grand jurors were aware of any "irregularities" in the proceedings, whether government personnel were "imped[ing]" their functions, or whether they were aware of any behavior that made them doubt the "integrity" of the proceedings. However, Magistrate Judge Arenas did not explore the possibility of government eavesdropping. Nonetheless, despite the general nature of the Magistrate's inquiry, the transcript of the exchanges between Magistrate and grand jurors contains several statements from the latter that highlight the need to continue the investigation. For example, several grand jurors including Grand Juror 1, Grand Juror 2 and Grand Juror 3 expressed their amazement and frustration at having the case taken from them so close to the time when they believed they were going to vote. Similarly, grand jurors 4 and 5 expressed surprise at Grand Jury 03-1's quick indictment, especially when Grand Jury 02-1's time considering evidence was almost four times longer than 03-1's. Finally, and more importantly, at least three grand jurors commented on the lack of privacy in the grand jury area, especially in the kitchenette where grand jurors take coffee. Though the government admittedly warned the grand jurors about the importance of keeping their voices down in the grand jury area, the grand jurors' comments cannot easily be ignored in

the context of potential Rule 6(d) violations and of the facts recounted below.

Resting on the "inconclusive" nature of the Magistrate's findings and on some of the grand jurors' answers, defendants again moved to Court for further investigation, including scientific testing of the grand jury area. (Docket Nos. 133, 164 and 167). Agreeing that such an important matter should not remain "inconclusive", and that a sufficient *prima facie* basis had been laid, the Court ordered an expert examination of the grand jury area examination through Orders dated February 3 and March 21, 2005. An acoustical study of the grand jury area was later conducted by acoustical engineer and professor Dr. Jorge Rocafort.

On July 16, 2005, while Dr. Rocafort conducted his examination, defendants submitted to the Court and the government an affidavit from former Criminal Division Assistant United States Attorney Joseph Frattallone-Marti, Esq. (Docket No. 182). Mr. Frattallone recounted an event from April 20, 2005, in which he witnessed FBI Special Agents Ivan J. Vitousek and Jose Luis Hernandez exiting a room adjacent to the Grand Jury witness room, where they had been for over a half-hour. (Aff. of Joseph Frattallone ¶ 5, Docket No. 182, Ex. 1). Mr. Frattallone confirmed that the door leading into the room from which the agents exited "had a sign posted forbidding entrance to all but grand jurors or words to that effect." (Aff. of Joseph Frattallone ¶ 5, Docket No. 182, Ex. 1). The government has not submitted any affidavit or other evidence rebutting Mr. Frattallone's version of events, even though they were notified nearly three months prior to filing their recusal motion. Instead, the government seems to acknowledge and adopt as true Mr. Frattallone's observations when it states that "[a]gents frequently are present outside during grand jury sessions to testify before grand juries...They are of course not permitted to observe witness testimony in the hearing room but

the testimony is not kept from them." (Gov't Mot. at 16 n.10, Docket No. 200). Regardless of what "frequently" happens, it is clear that even the government's hypothetical scenario is in direct violation of Local Rule 106(c)'s unequivocal admonition that "**no one** shall be permitted to wander about [or] sit in the corridors" of the grand jury area while the grand jury is in session. L.Cr.R. 16(c) (emphasis added). Even so, the government has never addressed directly the very specific version of events offered by Mr. Frattallone, which places FBI Agents Vitousek and Hernandez inside a room adjacent to the grand jury room and restricted to grand jurors. Thus, Mr. Frattallone's account of events remains unchallenged and unimpeached.

Mr. Frattallone's affidavit is further substantiated by a separate yet eerily similar occurrence recounted by former Special Assistant United States Attorney for the District of Puerto Rico Gary Montilla-Brogan, Esq. (Aff. of Gary Montilla, Docket No. 219). Mr. Montilla, an experienced attorney well acquainted with the grand jury area in this District, alleges that, on August 2005, while waiting for his client in the designated waiting room, he witnessed Trial Attorney Mary Butler and Special Agent Ivan Vitousek "exit[ing] from the break room into the waiting room at the same time or shortly after [his] client." (Aff. of Gary Montilla ¶ 4, Docket No. 219). Agent Vitousek's and Trial Attorney Butler's presence in a room restricted to grand jurors from which, as explained below, they could have overheard the grand jurors' conversations and deliberations "surprised and sufficiently concerned" Mr. Montilla, a concern the Court shares especially in light of the fact that such actions do not seem to be circumscribed to the case at bar. (Aff. of Gary Montilla ¶ 5, Docket No. 219).

Dr. Rocafort subsequently completed his expert acoustical examination of the grand jury space, and the Court made the study available to the

parties on August 2, 2005. (Docket No. 184). After a detailed and technical acoustical examination of the grand jury room, waiting room and kitchen, Dr. Rocafort found that "significant sound transmission occurs between the rooms," and that "[t]he intelligibility of single words was relatively high." (Dr. Rocafort's Report at 6). Importantly, Dr. Rocafort concluded that "[c]onfidential privacy is not maintained" in the grand jury rooms, (Id.), a conclusion confirmed by the testimony of several Grand Jury 02-1 grand jurors, by government attorneys, and by the experiences of Mr. Montilla as recounted in his affidavit.[11] Though weighty on their own, Dr. Rocafort's expert findings acquire even greater significance in light of Mr. Frattallone-Marti's and Mr. Montilla-Brogan's unchallenged affidavits, which place government personnel in areas restricted to grand jurors in two separate occasions, and from which they could have overheard the grand jurors' conversations and deliberations. These facts, taken together, greatly magnify the specter of potential government eavesdropping in violation of Rule 6(d) and Local Rule 106(c).

Confronted with these facts, the government employs three arguments. First, it suggests that the Magistrate's interviews with the grand jurors and his subsequent report should have ended the matter, and that, in any event, they vindicated the government's position. (Gov't Mot. at 8, Docket No. 200). As with any other referral of particular matters to a Magistrate Judge, a District Judge is free to adopt or reject the Magistrate's report and recommendation, in whole or in part. See 28

---

[11] Mr. Montilla stated that he has "certain and specific recollection from the time that [he] worked as a SAUSA that the voices of persons speaking inside the grand jury hearing room were audible and intelligible to persons inside the break room even when the door separating the break room and the grand jury hearing room was closed." (Aff. of Gary Montilla ¶ 3, Docket No. 219). Furthermore, Mr. Montilla recalled "mentioning to a Department of Justice Attorney with whom [he] was working that unauthorized persons would hear grand jury proceedings if they were in the break room while proceedings were ongoing.

U.S.C. § 636(b); L.Civ.R. 72(d); L.Crim.R. 157.1.   Additionally, given Magistrate Arenas' conclusion that the interviews were alone "inconclusive", it is vexing that the government considers the report a "vindication".   In light of the seriousness of the allegations involved, the evidence available, and the primacy of the rights at stake, the Court would expect all parties involved to be interested in the most conclusive answer possible, so as to dispel any doubts that might still hover over this case.   Consequently, because the Court is not bound by the Magistrate's report and, in any event, its inconclusiveness calls for further inquiry, the government's argument is unavailing.

Second, the government points to its sealed *ex parte* submissions of January 18 and February 1, 2005 explaining why Grand Jury 02-1 was not asked to indict, and suggests that the Court has unreasonably refused to credit its explanations and blanket denials of wrongdoing.   In fact, the government posits, albeit indirectly, that the Court's refusal to terminate its investigation in light of the government's affidavits and denials is further evidence of the Court's partiality.   As a general matter, courts may accept and even require government affidavits in connection with an investigation into grand jury secrecy violations.   See In re Grand Jury Proceedings, 814 F.2d 61 (1st Cir. 1987).   Once provided, the Court may, but is not obligated to, deem the government submissions sufficient to resolve the matter.   In fact, the First Circuit has held that a decision based solely on the government's *ex parte* denials of grand jury abuse

> would have certain problematic implications here.   Part of the government's argument in this case focused on the independence of the grand jury from the government's general prosecutorial strategies.   Yet, the government asks us to rely on an FBI Agent's unchallenged testimony to prove that the grand jury is acting independently from the Justice Department.

Id. at 72.   Where, as in the instant case, the defense comes forth with

specific evidence of potential grand jury secrecy violations, the Court acts within its discretion and duty in continuing to investigate despite the government's denials. See In re Grand Jury Investigation (Lance), 610 F.2d 202, 219 (5th Cir. 1980) (even in light of a responsive affidavit provided by the government denying the allegations of grand jury secrecy violations, "the detail as well as the seriousness of a [Rule 6] violation may militate in favor of a further investigation..."). See also Finn v. Schiller, 72 F.3d 1182, 1189 (4th Cir. 1996)(finding that the court has a **duty** to protect the integrity of grand jury proceedings, and remanding the case to the district court with instructions that it investigate the grand jury secrecy violations) (emphasis added).

Finally, the government notes that, even taking the defendants' version of the facts at face value, its decision to seek an indictment from Grand Jury 03-1 instead of 02-1 is unchallengeable under *United States v. Williams*, 504 U.S. 36 (1992). Though the government is correct in its contention that it was free to submit the case to a second grand jury even if the first was not willing to indict, the argument is nonetheless off the mark in the present context. Although the government is unquestionably endowed with wide discretion in its decision whether to submit a case to a particular grand jury, it is unquestionable that prosecutors are bound by the Federal Rules of Criminal Procedure in their actions. Thus, while the government could have decided not to seek an indictment from Grand Jury 02-1 for any reason, or no reason at all, it could not have reached its decision by means of a Rule 6(d) violation. To hold otherwise would create perverse incentives for prosecutors and government agents to violate the same rules meant to cabin their discretion and to protect the rights of grand jury targets and defendants.

Even in light of the government's blanket denials and importunements to the contrary, it is pellucid that the Court has before it an ample and

growing *prima facie* basis to investigate the government's possible violation of Rule 6(d) and Local Rule 106(c). Specifically, the Court's duty to investigate is triggered and justified by the following *prima facie* basis:

(1) An express allegation of a former Grand Jury 02-1 member expressing his concerns that government personnel might have been eavesdropping on the Grand Jury's deliberations and discussions;

(2) Testimony by several Grand Jurors regarding their surprise at not being able to vote on whether to indict after 20 sessions lasting a total of 73 hours;

(3) Dr. Rocafort's expert report confirming that there is "no confidential privacy" in the grand jury area, and thus establishing that the government had the opportunity to eavesdrop on the Grand Jury from adjacent rooms; and

(4) An uncontroverted sworn statement from an officer of this Court and former Assistant United States Attorney witnessing FBI Special Agents Ivan Vitousek and Jose Hernandez exiting a room adjacent to the grand jury room and strictly reserved for grand jurors.

(5) An affidavit from another attorney and former Special Assistant United States Attorney for the District of Puerto Rico who witnessed FBI Special Agent Ivan Vitousek and Trial Attorney Mary Butler exiting the same restricted area from which they could have overheard the grand jurors' deliberations.

Taken together, these facts would permit a reasonable inference that government personnel had eavesdropped on Grand Jury 02-1's deliberations, and that the information obtained from the eavesdropping prompted the government to take the case from Grand Jury 02-1 and present it anew to Grand Jury 03-1. This amounts to a *prima facie* showing of a Rule 106(d) violation and requires that the Court investigate the matter fully. See

In re Grand Jury Proceedings, 417 F.3d 18, 22-23 (1st Cir. 2005) (defining *prima facie* as "little more than a showing of whatever is required to permit some inferential leap sufficient to reach a particular outcome.").[12]

Given this *prima facie* showing, and because none of these facts are extrajudicial in nature, the government's argument that the Court's August 30, 2005 Order (Docket No. 195) continuing its investigation constitutes a basis for recusal must be, and hereby is, rejected.

## E. Prima Facie Evidence of Rule 6(e) Violations

The defense has also complained repeatedly to the Court of allegedly prejudicial leaks of grand jury information to the media.[13] As early in the case as April 21, 2004, defendants moved for a protective order regarding allegedly wrongful media leaks by the government. (Docket No. 22). In response, the United States professed to be "troubled by these disclosures" and vowed to "refer the matter for investigation." (Docket No. 23).[14] On July 9, 2004, Vazquez-Botet filed an informative motion alerting the Court to additional media leaks, this time in an article published in The San Juan Star newspaper that same day. (Docket Nos. 51 and 57).[15] The government again responded to defendant's concerns by

---

[12] In an abundance of caution, the Court underscores the narrowness of its holding. While unequivocally ruling that there is and has been a sufficient *prima facie* basis for the Court to exercise its duty to investigate potential grand jury secrecy violations, the Court in no way intimates whether any such violations have in fact occurred. This will only be clear after conclusion of the investigation in accordance with the parameters set forth in Section V(H) of this opinion.

[13] Vazquez-Botet also complained of the leaks to the U.S. Department of Justice Office of Professional Responsibility, which on March 25, 2004 "decided not to initiate an investigation into the alleged unauthorized disclosure." (Defs.' Resp., Docket No. 206, Composite Exhibit I).

[14] The record does not reflect whether the government in fact referred the matter for investigation or conducted an investigation of its own.

[15] Defendants appended the newspaper articles subject of Docket Nos. 22, 51 and 57 to their Response to the government's motion to recuse as Composite Exhibit 1. They later submitted translated versions (Docket No.

"categorically den[ying]" responsibility for the leaks, and denounced defense counsel for "[l]evying utterly unsubstantiated allegations" that "smear" the government and "erode civility." (Docket No. 53 at 1-2). However, the government reiterated its "concern about grand jury leaks," and proffered that it was "referring this latest press statement to the investigators to whom the prior allegations were referred." (Docket No. 53 at 2). As with the referral of "prior allegations," there is no evidence on record concerning a government investigation into the matter other than the letters sent by defense counsel to Department of Justice authorities. See discussion at n.12, *supra*. Concerned about the integrity of the judicial system in general and these proceedings in particular, the Court has manifested its concerns both prior to, and during, this case.[16]

When a violation of Rule 6(e) is alleged, the Court must first decide whether the moving party has presented a *prima facie* case of such misconduct. See, e.g., In re Sealed Case, No. 98-3077, 151 F.3d 1059, 1067-69 (D.C. Cir. 1998); In re Grand Jury Investigation (Lance), 610 F.2d

---

221) pursuant to the Court's November 28. 2005 Order (Docket No. 213). For the sake of ready reference, the Court has included the articles in this Opinion and Order as Composite Appendix A.

[16] In fact, allegations of improper media leaks in connection with grand jury proceedings in this District, and this Court's concern with them, are neither novel nor circumscribed to the instant case. On August 7, 2003, in its capacity as Acting Chief Judge, this judge sent a letter to U.S. Attorney for Puerto Rico H.S. Garcia in which it requested an immediate investigation into troubling leaks regarding an unrelated criminal case. Interestingly, referring the matter to then-Special-Agent-in-Charge Patrick Daly, the U.S. Attorney *sua sponte* requested that the investigation be expanded to include "two (2) additional apparent press leaks regarding grand jury and/or an ongoing criminal investigation related to the 'Supertubo' investigation." The "Supertubo" investigation later matured into the case now before the Court. Notably, the press leaks the United States Attorney complained of in his letter occurred prior to the issuance of the indictment, a fact that supports the inference that the information came from government sources. (The relevant exchange of letters between the Court and the U.S. Attorney is included as Composite Appendix B).

202, 214-20 (5th Cir. 1980). In determining whether a party alleging a violation of Rule 6(e) based on news media reports has established a *prima facie* case, a court must consider the following factors.

First, "there must be a clear indication that the media reports disclose information about 'matters occurring before the grand jury.'" Lance, 610 F.2d at 216. Courts have construed the phrase "matters occurring before the grand jury" to include any item that might reveal what occurred before the grand jury. See id. at 216-17. See also Senate of the Commonwealth of Puerto Rico v. United States Dep't of Justice, 823 F.2d 574, 582 (D.C. Cir. 1987) (secrecy violated when information tends to reveal some secret aspect of the grand jury's investigation). As explained above, Rule 6(e) does not protect only the transcript or the minutes of the grand jury proceedings, but also any information that would reveal the identities of the grand jurors or witnesses, the substance of testimony, the strategy or direction of the investigation, the grand jurors' deliberations or questions, or any comparable matter. Lance, 610 F.2d at 217.

In the instant case, the media reports contain numerous references to the identity and testimony of grand jury witnesses, including not only the content of the witnesses' testimony, but also their demeanor while testifying. For example, the December 8th, 2003 El Nuevo Dia article specifically referred to two witnesses who were subpoenaed by the grand jury, and alluded to the content and purpose of their testimony.[17] Similarly, the April 20th, 2004 El Nuevo Dia article identified, among

---

[17] This article, which was published 4 months prior to the first indictment in this case, noted that in order to corroborate a particular financial transaction "the manager of a security boxes company, property of Feliciano, and a messenger from that company were subpoenaed before the Grand Jury, according to sources of El Nuevo Dia." This statement clearly identifies witnesses before the grand jury as well as the purpose and content of their testimony.

others, Messrs. Jose Cobian-Guzman, Jose Granados-Navedo, and Marcos Morell-Corrada as grand jury witnesses, commented on the content of their testimonies, and even described two of these witnesses' appearance and demeanor before the grand jury.[18] That same article also reports the appearance before the grand jury of some of Vazquez-Botet's employees, and recounts their testimony about the "visits from Cobian Guzman and from the contractor's assistants to the medical office and delivery of a package, generally in a manila envelope." Likewise, the July 9th, 2004 San Juan Star article identified Mr. Morell as a grand jury witness and recounted his testimony in great detail.[19] Clearly, these articles revealed "matters occurring before the grand jury" insofar as they repeatedly referred to the identity of grand jury witnesses, the substance of their testimony, and even their demeanor while testifying. See Lance, 610 F.2d at 217.

With similar detail, the articles make repeated references to the direction and strategy of the investigation, a matter that has been held to be one "occurring before the grand jury" and thus covered by Rule 6(e). Lance, 610 F.2d at 217. The December 8, 2003 El Nuevo Dia article quoted

---

[18] With regards to Mr. Cobian-Guzman, the article noted that his testimony, along with documentary evidence and the testimony of the local contractors for the Super Aqueduct project who were allegedly extorted, was part of the evidence presented to the grand jury on Holy Thursday. With regards to Mr. Granados-Navedo, the newspaper reported that the grand jury "forced Granados Navedo...to testify", and described him as "looking nervous...[he] was tearful and did not face the members of the Grand Jury, as disclosed." The article also reported the content of Granados-Navedo's testimony, noting that he "confirmed the illegal payments..." Finally, the article reported that, "according to a source" "Mr. Morell appeared before the Grand Jury showing great verbal mastery and firm disposition. He declared that the payments he had received responded to a professional services contract he had with CAS, a Cobian Guzman company."

[19] The article reported that Morell testified on December 19 "for about two hours," and that "[h]e was questioned about $5,000 monthly payments he received from convicted contractor Jose Cobian Guzman from 1997-1999." It then went on to describe Morell's response and noted that Mr. Vazquez-Botet "never appeared before the grand jury but was a target from the start of the investigation."

"a federal source" for the proposition that "the alleged scheme of extortions related to the Super Aqueduct revolves around...Rene Vazquez Botet."   This revelation of the focus of the investigation is quite troubling, especially in light of the fact that the article was published 4 months before Vazquez-Botet was indicted.   Additionally, that same article makes reference to specific documents regarding Vazquez-Botet requested by the government from a private financial institution. Similarly, the April 20th, 2004 El Nuevo Dia article revealed that, according to "a source close to the Super Aqueduct investigation," the grand jury "ordered a banking institution to reveal the account statements of the store, which had belonged to the wife of Vazquez Botet and another family member..." That same article reported that "[t]he Grand Jury also obtained a file with all the payments that a local contractor made to the NPP and to public functionaries and of the party." Finally, the July 9, 2004 San Juan Star article also made detailed disclosures of the direction and strategy of the investigation.  The article reported that "Dr. Rene Vazquez Botet could face additional charges...as the grand jury revisits the investigation this month." Similarly, the article notes that "[t]rial attorney Mary Butler...is expected to present evidence this month before the grand jury, which could include calling the FBI agents who worked on the case to testify." It also cited an "investigator" as explaining that "the prosecutor could be asking the grand jury to return a superseding indictment before the end of the summer." Lastly, the San Juan Star article quoted FBI Special-Agent-in-Charge Luis Fraticelli saying that "[t]here are still a lot of things to be done [in the Super Aqueduct investigation]," and reiterating that a particular individual, Dr. Pedro Rossello, "was not the target of a probe."  Again, the reports in these newspaper articles referred to "matters occurring before the grand jury," as they commented on the direction and strategy of the investigation, and

Cr. No. 04-160 (PG)                                               Page 33

made detailed disclosures of specific evidence presented to the grand jury.  See Lance, 610 F.2d at 217.

However, the mere fact that newspaper articles reveal "matters occurring before the grand jury" does not suffice to constitute a *prima facie* case of a Rule 6(e) violation.  The article or articles "must [also] indicate the source of the information revealed to be one of those proscribed by Rule 6(e)..."  Lance, 610 F.2d at 216-17.  On this point, the District of Columbia Circuit has explained that:

> [T]he plaintiff's burden in a Rule 6(e)(2) proceeding is relatively light.  The articles submitted need only be susceptible to an interpretation that the information reported was furnished by an attorney or agent of the government; in fact "it is not necessary for [an] article to expressly implicate [the government] as the source of the disclosures if the nature of the information disclosed furnishes the connection."

Barry, 865 F.2d at 1325 (internal quotation omitted).  See also Lance, 610 F.2d at 217-218 (holding that it is not necessary for the article to expressly implicate the government as the source if the nature of the information disclosed furnishes the connection).  See also United States v. Flemmi, 233 F.Supp.2d 113, 117 (D. Mass. 2000) (citing *Barry* for the same proposition).  While "each article must be parsed individually, the testing for a *prima facie* case must also include a review which considers the whole spectrum of news articles."  Lance, 610 F.2d at 219.  Nearly every article provided by the defense in connection with the Rule 6(e) issue cites a "federal source,"[20] a "source close to the Super Aqueduct investigation,"[21] and "a source close to the investigation of the Federal authorities"[22] as the generators of the reported information.  Unlike the

---

[20] El Nuevo Dia, December 8, 2003.

[21] El Nuevo Dia, April 20, 2004.

[22] El Nuevo Dia, July 19, 2004.

"two sources familiar with the investigation" held to be insufficient in *Lance*, 610 F.2d at 218 n.9, the sources cited in the newspaper articles before the Court are more specific in their implication of the government. However, it is also true that these source attributions, without more, would normally be insufficient to establish a *prima facie* case of a Rule 6(e) violation, as they could have come from the witnesses, a grand juror, or the government, and still be a "federal source," or a source close to the investigation of the Federal authorities." See Lance, 610 F.2d at 218 n.9.   Nonetheless, in this case, as in *Flemmi*, the fact that these articles only cite general sources rather than particular government personnel

> cannot properly end the inquiry concerning whether the second prong of the *prima facie* test is met. Rather, the articles on their face present a substantial question of whether the required *prima facie* showing of a violation of Rule 6(e)...has been made and the court has not been provided with the affidavits that are typically filed voluntarily by the government in comparable cases.

Flemmi, 233 F.Supp.2d at 118.

In any event, the articles also refer to particular government officials in their discussion of the direction and strategy of the grand jury investigation.  Specifically, the July 9, 2004 San Juan Star article reported that "[t]rial attorney Mary Butler from the U.S. Justice Department's Public Integrity Section is expected to present evidence this month before the grand jury, which could include **calling the FBI agents who worked on the case to testify.**"  (Emphasis supplied).  Additionally, the San Juan Star refers to the revelation by "one investigator" that "the prosecutor could be asking the grand jury to return a superseding indictment before the end of the summer."  Finally, the San Juan Star reports that "FBI Special-Agent-in-Charge Luis Fraticelli...reiterated...that [Pedro] Rossello was not a target of a probe."  Even if the general sources do not suffice, the identification

of these particular government agents makes it all the more reasonable to presume that the leaks came from the government.

What is more, the content and context of much of the information in the articles satisfy the relatively light burden of making them "susceptible to an interpretation that the information reported was furnished by an attorney or agent of the government." Barry, 865 F.2d at 1325 (explaining that "it is not necessary for [an] article to expressly implicate [the government] as the source of the disclosures if the nature of the information disclosed furnishes the connection").  There are at least three prime examples in the newspaper articles before the Court of the kind of information that furnishes the presumptive connection between the disclosure and the government source.  First, the December 8, 2003 El Nuevo Dia article cites "a federal source" for the disclosure that "the alleged scheme of extortions related to the Super Aqueduct revolves around...Rene Vazquez Botet."   This revelation can reasonably be attributed to the government given that it cites a "federal source", that it speaks of the direction of the grand jury investigation specifically naming its main target, and, more importantly, does so 4 months before any indictment was handed down.  Similarly, the July 9, 2004 San Juan Star article reported that an "investigator" confirmed that "the prosecutor could be asking the grand jury to return an indictment before the end of the summer."[23]   Even ignoring the attribution of the disclosure to "an investigator," at this juncture, and in light of the dearth of affidavits from the government, there is no reasonable inference other than that the government was the source of this detailed information about the direction

---

[23] The government in fact sought such a superseding indictment, which was handed down on March 3, 2005 (Docket No. 152).

of the investigation.[24] Lastly, the same article's reference to DOJ trial attorney Mary Butler in the context of the expectation that she "would present evidence [in July] before the grand jury, which could include calling the FBI agents who worked on the case to testify," strongly suggests a nexus between the divulged information and government personnel. Likewise, the San Juan Star's report that SAC Luis Fraticelli told reporters that Pedro Rossello was not a target of the grand jury investigation not only revealed a "matter occurring before the grand jury," but also came directly from the horse's mouth: a government agent covered by the secrecy mandate of Rule 6(e). Again, the substance, nature and context of these disclosures make them susceptible to the "interpretation that the information reported was furnished by an attorney or agent of the government," and thus raise the presumption of government misconduct; a presumption that, as explained below, the government has not properly controverted in this case. Barry, 865 F.2d at 1325.

A third consideration the Court must bring to bear in its analysis is that, in light of the broad protections accorded to the media by the First Amendment, the Court "must assume that all statements in the news report[s] are correct." Lance, 610 F.2d at 219. As the Lance Court explained, this assumption is a "necessary safeguard to the enforcement of Rule 6(e)," because the complainant will seldom have access to anything beyond the text of the relevant report while the government is in the best position to know whether it is responsible for a violation. Id.[25] Thus,

---

[24] See, e.g. Lance, 610 F.2d at 218 (holding that "[d]isclosures which expressly identify when an indictment would be presented to the grand jury, the nature of the crimes which would be charged, and the number of persons who would be charged run afoul of the secrecy requirements codified in Rule 6(e). It is not necessary for the article to expressly implicate the Justice Department as the source of the disclosures...).

[25] See also In re Special April 1977 Grand Jury, 587 F.2d 889, 892-93 (7th Cir. 1978); United States v. Mitchell, 372 F.Supp. 1239, 1247-48 (S.D.N.Y. 1973); United States v. Archer, 355 F.Supp. 981, 989 (S.D.N.Y.

the government's argument that the newspaper articles "guessed (mostly incorrectly) at next steps in the grand jury investigation" is of no moment.   (Gov't Reply at 4, Docket No. 211).   Even assuming that the articles were in fact incorrect (a rather generous assumption in this case), the inaccuracy is irrelevant for purposes of the Rule 6(e) inquiry as the Court must take the articles as true.   Lance, 610 F.2d at 219.

Fourth, a court "must consider the nature of the relief requested and the extent to which it interferes with the grand jury process."   Lance, 610 F.2d at 219.   Aside from their initial demand for a protective order (Docket No. 22), defendants in this case have only requested an investigation into potential Rule 6(e) violations, a request that remains unchanged at this juncture. Admittedly, drastic remedies like dismissing the indictment, quashing a subpoena ad testificandum, or dismissing a grand jury have been held to be highly intrusive into the grand jury's function, thus requiring movants to carry "a heavy burden in attempting to justify such relief."   Lance, 610 F.2d at 219.   In such situations, courts have been reluctant to find that references by newspapers to general sources such as "officials," "informed sources," or "sources close to the investigation," sufficiently  implicated persons covered by Rule 6(e)'s prohibition to warrant such relief where those persons swore they had not breached grand jury secrecy.   Id.   On the other hand, the Fifth Circuit has held that "a prima facie case to secure a hearing on whether to impose contempt sanctions upon government attorneys...does not require as strong a showing" because "[s]uch a hearing carries little threat of conflict with the grand jury proceedings."   Analogously, the relief requested by the defendants in the instant case, as well as the Court's chosen course of action delineated in Section V(H), infra, have been, and

1972); United States v. Sweig, 316 F.Supp. 1148, 1153-55 (S.D.N.Y. 1970); United States v. Kahaner, 204 F.Supp. 921, 922-23 (S.D.N.Y. 1962).

will continue to be, minimally intrusive, if at all, into the grand jury's function. For one, the Court did not interfere in any way with either Grand Jury while they were in session, as the Court's investigation commenced once the indictment had been returned. Similarly, the Magistrate's questioning of the members of Grand Jury 02-1 in no way interfered with that grand jury's or Grand Jury 03-1's functions, as the former had already been disbanded, and the latter had already returned the indictment. Consequently, given the unintrusive nature of the remedy the defense has requested and the weight of the evidence on record, it is clear that the Court's investigation did and does not impermissibly interfere with the grand jury's function and, thus, was, and continues to be, warranted.

Finally, the Court "must weigh any evidence presented by the government to rebut the assumed truthfulness of reports which otherwise make a *prima facie* case of misconduct." Lance, 610 F.2d at 219. Aside from its blanket, unsworn denials of government misconduct, the government has not provided the Court with any evidence to contradict the information put forth by the defense. As explained above, the government's complaints about the Court's alleged refusal to credit its blanket unsworn denials of media leaks is of little moment. See Lance, 610 F.2d at 219 (even in light of a responsive affidavit provided by the government denying the allegations of grand jury secrecy violations, "the detail as well as the seriousness of a [Rule 6] violation may militate in favor of a further investigation..."). In any event, the government has not provided affidavits denying the allegations of Rule 6(e) violations. See United States v. Flemmi, 233 F.Supp.2d 113, 117 (D. Mass. 2000) (noting that when a question of possible misconduct is presented by media reports and the government does not concede that a *prima facie* case exists, the government almost always file such affidavits). In light of the government's failure

to provide such affidavits, and of the disclosures discussed above, the government's unsworn denials and arguments are insufficient to end the inquiry at this stage. See Id. at 118.

In sum, the defense has come forth with a series of newspaper articles that, parsed individually and taken as a whole, present a substantial question of whether a Rule 6(e) violation has occurred. Because the Court must take the content of these reports as true, Lance, 610 F.2d at 219, and the government has not provided the affidavits that are typically filed voluntarily in comparable cases, Id., the inference of government misconduct remains unrebutted, and the Court had the authority in fact and law to investigate.   See, e.g., Flemmi, 233 F.Supp.2d at 118-119.  For the same reasons, the Court will continue its investigation as detailed in Section V(H), *infra*.  Id.[26]

## F. Sealed and Ex-parte Nature of the Court's Investigation

Seemingly aware of the fatal shortcomings of its legal arguments, the government characterizes the Court's investigation as "secret", a qualification completely divorced from reality and dangerously misleading. (Gov't Mot. at 1, Docket No. 200). There are two possible interpretations of the government's importunements about the "secrecy" of the Court's investigation, neither of which holds water. Quite simply, there was and is nothing secret about the Court's investigation, at least as far as the government is concerned.

First, by complaining that the investigation has been "secret", the government might be suggesting, as the word itself seems to, that it was kept in the dark as to the existence of the Court's inquiry into potential grand jury secrecy violations. However, as detailed in section I, *supra*,

[26] The Court reiterates that its finding of a *prima facie* case, which warrants the continuation of the investigation at this juncture, in no way suggests that the government has in fact violated Rule 6(e).  See discussion at n.11, *supra*.

this argument would be frivolous, at best.  Pursuant to a June 1, 2004 *ex parte* sealed defense motion (Docket No. 35), the Court issued a sealed Order on November 9, 2004 ordering an investigation into potential grand jury secrecy violations and referring the matter to Chief Magistrate Judge Justo Arenas.  (Docket No. 109).  Upon the Magistrate's completion of his report, the Court made the same available to the government and the defense during a March 14, 2005 Status Conference.    (Docket No. 159). Pursuant to another *ex parte* sealed defense motion (Docket No. 133), during the March 14, 2005 Conference the Court further advised the parties of its intention to expand its investigation by conducting an expert acoustical examination of the grand jury room and adjacent areas.    The government was also notified by defense counsel of another motion germane to the Court's investigation, which was accompanied by an affidavit from former Assistant United States Attorney Joseph Frattallone-Marti.  (Aff. of Joseph Frattallone, Docket No. 182).  From this abridged recital of the relevant facts, it is obvious that the government was and has been well aware of the Court's investigation.  These facts equally discredit the government's contention that the Court has proceeded "with no input from or notice to the government."  (Gov't Mot. at 15, Docket No. 200).    In fact, the government filed an opposition (Docket No. 178) to one of the defense's motions for additional investigation in light of the Magistrate Judge's report (Docket No. 167) almost three months prior to requesting the Court's recusal.

The existence of the investigation being known to the government, the only other conceivable interpretation of its "secrecy" argument is as an objection to the Court's decision to proceed through *ex parte* sealed submissions and *in camera* review. However, this argument also proves unavailing.  The "use of *in camera* review in proceedings collateral to a grand jury investigation is by no means novel."  In re Sealed Case No. 98-

3077, 151 F.3d 1059, 1074 (D.C. Cir. 1998). In fact, *in camera* review of
a party's *ex parte* proffer "is the most appropriate way to conduct
proceedings in Rule 6(e)(2) cases and protect grand jury secrecy." Id.
This *in camera* review of a complaining party's *ex parte* submissions is
"necessary due to the paramount concern of all courts for the sanctity and
secrecy of grand jury proceedings." Id. See also In re Grand Jury
Proceedings, 417 F.3d 18, 20 (1st Cir. 2005) (noting that "[s]uch *ex parte*
submissions, although surprising to those unacquainted with the practice,
have precedent in certain contexts, including grand jury matters and
privilege claims.") (citations omitted); In re Grand Jury, 103 F.3d 1140,
1145 (3d Cir.), *cert. denied*, 117 S.Ct. 2412 (1997) (holding that "*[e]x
parte in camera* hearings have been held proper in order to preserve the
ongoing interest in grand jury secrecy"). Significantly, in *In re Sealed
Case*, the District of Columbia Circuit expressly sanctioned the use of *ex
parte in camera* procedures to investigate possible Rule 6(e) violations,
refusing "unnecessarily to cabin the district court's discretion as to the
type of factfinding tools it may use" in its investigation. In re Sealed
Case No. 98-3077, 151 F.3d at 1076. Thus, in the context of
investigations into potential Rule 6(d) violations, only after the Court
finds such violation has occurred is it appropriate to allow the parties
to participate in the proceedings to advocate for the "appropriate
remedy." Id. (citing Barry, 865 F.2d at 1321-22.

It is clear that the government was well aware of the existence of
the Court's inquiry into potential grand jury secrecy violations, and that
the Court's decision to conduct the investigation through sealed *ex parte*
submissions from the parties was not only within its discretion, but also
consistent with the overwhelming weight of precedent. Interestingly, the
government availed itself of the Court's *ex parte* proceedings in at least
two occasions, the most recent of which came to pass when the government

invited the Court to employ *ex parte* procedures in connection with its filing of an affidavit detailing the government's alleged reasons for switching from Grand Jury 02-1 to 03-1. The government simply cannot have its cake and eat it, too. See United States v. Tierney, 760 F.2d 382, 388 (1st Cir. 1985) (noting that "[h]aving one's cake and eating it, too, is not in fashion in this circuit."). Consequently, the government's characterization of the Court's investigation as secret is factually baseless and legally unhelpful.

## G. Unsealed nature of August 30, 2005 Order

In yet another glaring and troubling example of misleading citation and reference, the government next claims that the Court publicly issued its August 30, 2005 Order staying the case *sine die* (Docket No. 195) "in a manner that would only taint the government in the eyes of the public." The government either misreads or deliberately misquotes the Court's August 30, 2005 Order, as the same was carefully and deliberately drafted so as not to cast public doubts over, or level accusations against, either party. Additionally, contrary to the government's suggestion, the only reference to the defendants' rights in the Order was in the context of the Court's exclusion of the duration of its investigation from the Speedy Trial Act, and not in the context of its investigation. In sum, no reader of the August 30th Order could have gleaned the focus or extent of the Court's investigation from the text of its August 30th Order. Consequently, any "taint" the government has suffered in the eyes of the public is of its own making, as it expressly divulged the purpose and scope of the Court's investigation to the public via the unsealed version of its recusal motion. (Docket No. 197). To claim that the Court has prejudiced it through its Order while divulging the nature and purpose of the Court's investigation in violation of Local Rule 106(b) is simply untenable. See Tierney, 760 F.2d at 388.

## H. *The Government's Motions to Stay and Terminate the Investigation*

For the reasons discussed above, the government's motions to terminate the Court's investigation (Docket Nos. 198 and 200) are **DENIED**, as the investigation is within the duties and discretion of this Court. The Court's investigation into potential grand jury secrecy violations will proceed in accordance with the steps and parameters that follow. After full compliance with these measures, the Court's investigation will be completed, and the Court will issue a substantive Opinion and Order on the matter. Likewise, because the Court will ultimately deny the government's recusal motion, the motions to stay the investigation pending reassignment to another judge (Docket Nos. 198 and 200) are **DENIED**.

With regards to potential Rule 6(d) and Local Rule 106(c) violations, the Court will re-interview all members of grand jury 02-1. For this purpose, both the government and the defense are **ORDERED** to provide the Court with no more than 10 suggested questions per side. Of course, the Court reserves the right to accept or reject these questions and/or ask questions of its own. Additionally, the government is **ORDERED** to file *ex parte* sealed affidavits from each of the government employees tied to the instant case who were or might have been present in the surrounding area of the grand jury room while Grand Jury 02-1 was in session. See United States v. Flemmi, 233 F.Supp.2d 113, 119 (D. Mass. 2000) (ordering government officials to submit affidavits explaining their role, if any, in alleged violations of Rule 6). In light of the evidence presented by the defense, the government's filings shall include affidavits from Special Agent Ivan Vitousek and Jose Luis Hernandez, both of which shall respond to the allegations contained in Mr. Frattallone-Marti's and Mr. Montilla-Brogan's affidavits (Docket Nos. 182, Ex. 1, and 219). See id. Finally, the government is **ORDERED** to certify whether or not Special Agent Vitousek was at any time sworn in as agent of Grand Jury 02-1, by

submitting a sealed affidavit or the relevant grand jury transcripts.

In the context of potential Rule 6(e) violations, the government is **ORDERED** to file, *ex parte* and under seal, affidavits from each of the government employees, including government attorneys and investigators, authorized to have access to information obtained in any grand jury investigation of the case against Vazquez-Botet and Morell-Corrada. See Flemmi, 233 F.Supp.2d at 119 (ordering the government to produce affidavits from government agents and attorneys to determine whether a Rule 6(e) violation had occurred).

The Court notes that, barring a compelling showing of bias by the defense, it is not now considering the possible dismissal of the indictment as a remedy for any grand jury secrecy violations.   If information subject to Rule 6(e) has in fact been improperly disclosed and/or the government has violated Rule 6(d) or Local Rule 106(c), any individual responsible could be held in criminal or civil contempt and punished accordingly.  See Fed. R. Crim. P. 6(e)(7); Blalock v. United States, 844 F.2d 1546, 1558 (11th Cir. 1988) (Tjoflat, J., concurring). The Court may also impart equitable relief "depending upon the nature of the violation and what the trial court deems necessary to prevent further unlawful disclosures." In re Sealed Case No. 98-3077, 151 F.3d 1059, 1068 (D.C. Cir. 1998) (quoting Barry v. United States, 865 F.2d 1317, 1323 (D.C. Cir. 1989)) (internal citations omitted).

## VI. THE *RIVERA-RANGEL* CASE

Sensing the weakness of its central argument, the government next points to this Court's rulings in the case of United States v. Rivera-Rangel, Cr. No. 02-98 (PG), as a basis for recusal.[27]  Specifically, the

---

[27] The Court's relevant Opinion and Orders in Cr. No. 02-98 are attached hereto as Composite Appendix C.

government argues that the Court's grant of a judgment of acquittal and, in the alternative, a new trial (Cr. No. 02-98, Docket Nos. 131 and 149), as well as the First Circuit's reversal of those rulings, United States v. Rivera-Rangel, 396 F.3d 476 (1st Cir. 2005), somehow make it a partial tribunal unfit to preside over the present case.[28] As a threshold matter, it is significant to note that, as far as the Court is aware, Rivera-Rangel is neither a party nor a witness in the instant action, nor were Vazquez-Botet or Morell-Corrada parties or witnesses in Rivera-Rangel's prosecution. Thus, it is beyond this Court's understanding how its rulings in the *Rivera-Rangel* case are in any way relevant to the matter now before it.[29]

This irrelevance notwithstanding, the government's reliance on the *Rivera-Rangel* case rings hollow for two reasons. First, as a doctrinal matter, it is axiomatic that "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion...Almost invariably they are proper grounds for appeal, not for recusal." Liteky, 51 U.S. at 555. This "may be true even when the judicial rulings in question are erroneous." In re Boston's Children First, 244 F.3d 164, 167, n. 7 (1st Cir. 2001). Ignoring this clear precedent, and as if playing to a lay audience, the government makes reference to the Circuit's finding of "manifest abuse of discretion" and its citation of United

---

[28] In an effort to put this Court's rulings in Cr. No. 02-98 in their proper context, it is useful to note that the Court denied defendant's first motion for judgment of acquittal. (Cr. No. 02-98, Docket No. 111).

[29] As discussed in more detail in Section VII, *infra*, the government misleadingly cites the First Circuit's opinion in the Rivera-Rangel Case for the proposition that the Court of Appeals "has recently removed the Court from presiding over another public corruption case involving a defendant of the same political party as the Court and the defendants here." (Gov't Mot. at 2, Docket No. 200). However, even the most searching inquiry into the First Circuit's opinion does not reveal any reference to the Court's or the defendant's political affiliation.

States v. Rothrock, 806 F.2d 318, 322 (1st Cir. 1986) for the "13th juror"
proposition to somehow suggest that this Court engaged in misconduct in
its decision to grant Rivera-Rangel's motion for judgment of acquittal.
However, the Circuit's reference to "manifest abuse of discretion" is
merely the restatement of the standard of review applicable to a district
court's grant of a new trial on *Brady* violation bases, and not a finding
of partiality or misconduct. See Brady v. Maryland, 373 U.S. 83 (1963).
Thus, the government's reference to the Circuit's reversal of this Court's
orders in the *Rivera-Rangel* case makes much ado about nothing: this Court
made a legal determination which was later reversed on appeal, a series
of events that is hardly remarkable in our system of justice.[30]   The
Court's involvement with the *Rivera-Rangel* matter ended with the Court of
Appeals' remand to a different judge, and has no bearing on the instant
case.   "Painting black lines on the sides of a horse and calling it a
zebra does not make it one." United States v. Vazquez Rivera, 135 F.3d
172, 177 (1st Cir. 1998). Similarly, the government's attempt to make the
*Rivera-Rangel* case an issue now is simply a contrived and unavailing
stretch. Thus, it is abundantly clear that, in accordance with Liteky and
its progeny, the Court's *Rivera-Rangel* legal rulings and their eventual
reversal, even if relevant, are not proper grounds for recusal.

Finally, taking a slightly different yet equally flawed tack, the
government argues that "[t]he Court's credibility findings [in the *Rivera-
Rangel* case] were reversed by the First Circuit as unjustified in February
2005, but the Court's skepticism in *Rivera-Rangel* towards SA Vitousek-who
will be a trial witness here-has affected the Court's neutrality in this

---

[30] Additionally, the government correctly makes reference to the fact
that the Circuit Court "*sua sponte* reassigned the case to another judge for
sentencing." However, this, too, is hardly noteworthy, as courts of appeal
habitually reassign cases to a different judge for sentencing than the one
who presided over the trial.

case." (Gov't Mot. at 18, Docket No. 200).[31]  The Court must note at the outset that nowhere in it's relevant opinion and orders (Cr. 02-98, Docket Nos. 131 and 149) is there any mention of Special Agent Vitousek or of his credibility or lack thereof.  Similarly, the opinion of the Court of Appeals is also devoid of any mention of Mr. Vitousek.  Consequently, it strains logic to conclude that certain alleged credibility determinations, which are nowhere to be found in either this Court's or the Circuit Court's opinions, somehow disable this judicial officer from presiding over the instant case.

However, even if these credibility determinations existed and were somehow relevant, the government's reliance on them would again be fatally misplaced.  As explained above, judicial rulings, even if erroneous, are not sufficient grounds for recusal under § 455(a). In re Boston's Children First, 244 F.3d at 167, n.7.  Additionally, with regards to credibility determinations in particular, the First Circuit has made clear that, because "it is a judge's job to make credibility determinations", In re Cooper and Lynn, 821 F.2d 833, 838 (1st Cir. 1987), such determinations cannot be a basis for claiming the extrajudicial or personal bias that would serve as the necessary predicate for § 455(a) recusal. Blizard v. Frechette, 601 F.2d 1217, 1220-1222 (1st Cir. 1979).  In disagreement with

---

[31] The government also seeks to cement its charge of bias against Special Agent Vitousek through Special-Agent-in-Charge Luis Fraticelli's affidavit, wherein he alleges that during a meeting with Judges Laffitte and Perez-Gimenez, Judge Laffitte stated that "SA Vitousek was responsible for recent media leaks." (Aff. of SAC Fraticelli ¶ 3, Docket No. 200, Ex. 1).  I do not recall Judge Laffitte making any such accusation, and he has denied it under oath, explaining that during the conversation he "merely brought to [SAC Fraticelli's] attention the striking coincidence that in several cases where grand jury leaks appeared to be a problem, the same AUSA and FBI Agent were involved." (Aff. of Judge Laffitte ¶ 3, Docket No. 217).  In fact, Judge Laffitte explained that, during a visit to his office, it was FBI Inspector James Finch who "volunteered the name Vitousek when he stated that his name kept coming up." (Id.).  In any event, even assuming that Judge Laffitte made the alleged comment, it cannot be attributed to this Court, and is thus irrelevant to the matter of recusal.

the Court's determinations in the *Rivera-Rangel* case, the government successfully exhausted the remedy provided to it by law: an appeal to the First Circuit. It cannot now seek recusal on a completely unrelated case based on nothing more than inaccurate and speculative inferences drawn from the Circuit Court's opinion. See Liteky, 51 U.S. at 555.

Because "the dead tree gives no shelter," the Court need not go further with regards to the government's reliance on the *Rivera-Rangel* case. T.S. ELLIOT, THE WASTELAND (Boni & Liveright 1922).

## VII. POLITICAL AFFILIATION

In a last ditch effort to cast doubt over the Court's impartiality, the government argues that the "Court cannot be a neutral arbiter in cases involving highly-placed [New Progressive Party] officials." (Gov't Mot. at 18, Docket No. 200). It is well settled that "[e]very judge comes to the bench with a lifetime of background experiences, a roster of associations, and a myriad of views. This past history, in and of itself is seldom sufficient to require recusal." Comfort v. Lynn School Committee, 418 F.3d 1, 26 (1st Cir. 2005). Unless there is "some direct link that establishes a reasonable basis for doubting impartiality," the judge should not step aside. Id.[32] In an attempt to establish some sort of link between the Court's alleged political affiliation and the instant case, the government builds its argument on two wobbly pillars: (1) an affidavit from FBI Special-Agent-in-Charge Luis S. Fraticelli (Aff. of SAC Fraticelli, Docket No. 200, Ex. 1); and (2) the First Circuit's reversal of some of this Court's rulings in the Case of *U.S. v. Rivera-Rangel*, 396

---

[32] Indeed, to hold that a judge's political affiliation, without more, is a sufficient ground for recusal would turn the federal judiciary into a virtually unpeopled desert, as "it is common knowledge...that the first step to the federal bench for most judges is either a history of active partisan politics or strong political connections..." Home Placement Service, Inc. v. Providence Journal Co., 739 F.2d 671, 675 (1st Cir. 1984).

F.3d 476 (1st Cir. 2005). The Court will consider each in turn.

Before delving into the government's references to the Court's alleged political affiliation, however, we pause to consider a threshold matter. The lynchpin of the government's argument is that the Court is a "strong [supporter] of the NPP [New Progressive Party]," the same party Vazquez-Botet and Morell-Corrada worked for during the time the charged offenses allegedly occurred. (Aff. of SAC Fraticelli ¶ 4, Docket No. 200, Ex. 1). Indeed, if it is not successful in proving the Court's alleged political affiliation, the government's argument falls flat on its face. A searching study of the record in the instant case reveals only one attempt to establish the Court's political affiliation, which is contained in the affidavit of Special-Agent-in-Charge Luis S. Fraticelli.[33]  In his sworn statement appended to the government's sealed motion SAC Fraticelli states that "[t]he NPP is the pro-statehood party in Puerto Rico, and [he] know[s] both Judge Laffitte and Judge Perez-Gimenez to be strong supporters of the NPP." (Aff. of SAC Fraticelli ¶ 4, Docket No. 200, Ex. 1). SAC Fraticelli does not offer any evidence for his conclusion about this Court's or Judge Laffitte's political affiliation, and curiously claims that he "do[es] not know whether former acting U.S. Attorney Guillermo Gil and AUSA Kellog are supporters of the PDP [Popular Democratic Party]." (Id.)[34]  However haunting the image of federal agents

---

[33] Although the government includes a conclusory footnote in which it claims that "[t]he Court and the defendants in this case are members of the NPP, the pro-Statehood party in Puerto Rico," it fails to provide any substantiation or corroboration for its remark. (Gov't Mot. at 2 n.1, Docket No. 200).

[34] Even assuming the Court shares the pro-statehood ideology, SAC Fraticelli's reference to the fact that the NPP is the pro-statehood party in Puerto Rico cannot seriously be considered evidence of party affiliation for at least two reasons. First, as a practical and logical matter not all individuals of pro-statehood mentality are required to be, or in fact are, members of the NPP. That is, it is possible to be pro-statehood and not "a strong supporter of the NPP." Second, it is well settled that "our system

(especially those with supervisory duties like Special-Agent-in-Charge Fraticelli) investigating and profiling individuals in order to ascertain their political affiliations might be, the Court need not dwell on it at this point. Suffice it to state that SAC Fraticelli's unsubstantiated and uncorroborated conclusion that two Article III judges with a long record of judicial service are "strong supporters" of one political party or another cannot, even in the most generous analysis, be enough to prove what the government must: that the Court is in fact a member or supporter of the same political party as the defendants. This utter lack of evidence notwithstanding, and in the interest of thoroughness, the Court will assume that the government in fact showed that the Court is affiliated to the NPP and will proceed with its analysis.

## A. SAC Fraticelli's Affidavit

As previously mentioned, SAC Fraticelli provided an affidavit, which the government appended to its recusal motion as Exhibit 1. (Aff. of SAC Fraticelli, Docket No. 200, Ex. 1). In the affidavit, SAC Fraticelli recounts his version of two meetings with the Court. As more fully described in section VI, supra, the first meeting between SAC Fraticelli and the Court took place in the chambers of then Chief Judge Laffitte and dealt with alleged press leaks "in several highly-publicized cases in which the FBI was the lead investigative agency." (Aff. of SAC Fraticelli ¶¶ 2-3, Docket No. 200, Ex. 1).[35]   According to SAC Fraticelli's own

of justice would be paralyzed if judges were disqualified[...]because of views about[...]abstract policy issues." Camacho v. Autoridad de Telefonos de Puerto Rico, 868 F.2d at 491-492 (also holding that "[n]o reasonable person could seriously have questioned Judge Perez-Gimenez's impartiality because of his generalized pro-statehood philosophy").

[35] As mentioned above, the Court's and Judge Laffitte's concern with repeated press leaks in this District is not new, and was shared by U.S. Attorney H.S. Garcia. In fact, U.S. Attorney Garcia referred unrelated leaks for investigation, and sua sponte expanded the investigation to include leaks in the "Supertubo" case. See Section V(E) n.14, supra, and

affidavit, there was only one reference allegedly made to political parties in general or the NPP in particular during that meeting, and the same was allegedly made by Judge Laffitte, not this Court.[36] Even making the overgenerous assumption that Judge Laffitte in fact made the comment, and it was somehow indicative of political affiliation or bias (an inferential leap this Court in good conscience cannot make), it surely was not and cannot be attributed to this Court.[37] Thus, SAC Fraticelli's recital of his initial meeting with this Court and Judge Laffitte does not provide the required "direct link" between the Court's alleged political affiliation and the instant case. See Comfort, 418 F.3d at 26.

The second reference to political affiliation in SAC Fraticelli's affidavit arises in the context of a second meeting with the Court, this time in its own chambers and without the presence of Judge Laffitte. In his statement, SAC Fraticelli alleges that during the meeting the Court

> informed [him] that a 'confidential source', which [the Court] refused to name, told [the Court] that the press was alerted by someone in the USAO about an important witness appearing before the grand jury in relation to the Superaqueduct case. Judge Perez-Gimenez advised [SAC Fraticelli] to be careful with AUSA Nereida Melendez because she is affiliated with the PDP. [Fraticelli] took this to mean that Judge Perez-Gimenez now

---

Composite Appendix A.

[36] According to Fraticelli, Judge Laffitte allegedly asked him whether "the FBI had a squad specifically dedicated to investigating members of the NPP," which Fraticelli denied. (Aff. of SAC Fraticelli ¶ 5, Docket No. 200, Ex. 1). I do not recall Judge Laffitte asking such a question, and he has categorically denied doing so. (Aff. of Judge Laffitte ¶ 6, Docket No. 217).

[37] The implausibility of this assumption is further underscored by Judge Laffitte's affidavit, wherein he clarifies that he has "never discussed politics with Agent Fraticelli," and has "not been involved in any political fundraising or other political activities for more than 20 years." (Aff. of Judge Laffitte ¶ 5, Docket No. 217). Furthermore, Judge Laffitte notes "[i]nsofar as [Agent Fraticelli] is insinuating that there is some question as to [his] impartiality in political corruption cases involving members of the NPP, his accusation is baseless and unfounded." (Id.).

believed that AUSA Melendez was the source of the alleged
'leaks.'

(Aff. of SAC Fraticelli ¶ 9, Docket No. 200, Ex. 1). That what SAC

Fraticelli "took the Court's comments to mean" is a vague and speculative

ground on which to base a recusal motion is hard to question. Even

ignoring this, the Court makes two observations which should put

Fraticelli's statements and their relevance to the recusal issue in their

proper context.

First, assuming, *arguendo*, the Court made such statements and in fact

referred to AUSA Melendez's political affiliation in a show of bias or

partiality, it is hard to see how those comments, even if inappropriate,

would warrant recusal from the instant case. This is so because AUSA

Melendez is not an attorney of record for the government in the present

case. Claiming that a judge should recuse himself on grounds that he is

politically biased against an attorney who is not related in any way to

the case is simply untenable. Second, the Court's statements to SAC

Fraticelli regarding AUSA Melendez's possible political affiliation must

be considered in their proper context. See In re Martinez-Catala, 129

F.3d 213, 220 (1st Cir. 1997) (noting that "however dramatic the phrase

may sound in the abstract, in context it was here used as part of a

perfectly permissible suggestion by the district judge."); Town of Norfolk

v. U.S. Army Corps of Engineers, 968 F.2d 1438, 1460 (1st Cir. 1992) (also

highlighting the importance of context in evaluating a judge's

statements). Though subject to misinterpretation when considered in a

vacuum, the Court's alleged reference to AUSA Melendez's potential party

affiliation with the PDP was particularly relevant given that, if it were

found to be true, it would shed helpful light on the recurrent leaks

regarding high-profile public corruption cases involving NPP officials.

After all, in the context of recurring and increasingly worrisome leaks

concerning grand jury proceedings, it was perfectly reasonable to suggest

that, given the defendants' militancy with the NPP, a possible source for the leaks could have been members of that party's main political opposition, the PDP.   In other words, the Court would have found it equally logical and reasonable to suggest that the source of media leaks concerning grand jury targets and criminal defendants identified with the PDP could be an individual identified with the NPP who was in a position to make such leaks.  Thus, even if relevant, taken in its proper context, the Court's alleged statement to SAC Fraticelli regarding AUSA Melendez's alleged political affiliation was not a statement of bias or partiality in favor of NPP supporters and against PDP militants, but an objective, reasonable, and relevant assessment made to the director of the federal agency tasked with investigating recurrent media leaks about ongoing grand jury proceedings involving high-profile former NPP officials.

Additionally, as part of its investigation, the Court learned that Assistant United States Attorney Guillermo Gil told the first grand jury summoned to investigate the facts underlying the instant case (Grand Jury 02-1) that "corruption has a first and last name, which was the New Progressive Party."   (Transcript of Chief Magistrate Judge Arena's questions to grand jury 02-1, December 7, 2004 at 7).  This outrageous injection of politics into the grand jury room, and before a grand jury empaneled to hear a case involving former New Progressive Party officials, makes it legitimate and reasonable (if not obvious) for the Court to suggest that a possible source of grand jury media leaks could be individuals identified with the NPP's political opposition.   This suggestion, however, in no way intimates the Court's own party allegiance, nor does it provide an objective basis for a knowledgeable individual to reasonably question its impartiality. Additionally, the Court approvingly notes the defense's suggestion that it would be untenable to allow the government to "unjustly inject politics into the case and then claim the

trial judge must be disqualified because the case has become political due to some connection between the government's improper accusations and the judge." (Defs.' Resp. at 40, Docket No. 206). The Court will not sanction such contrived and strained efforts to effectively manufacture grounds for recusal where there are otherwise none. Mayberry v. Pennsylvania, 400 U.S. 455, 463 (1971). See, e.g., In re United States, 158 F.3d 26, 35 (1 st Cir. 1998) (holding that a party "cannot cast sinister aspersions, fail to provide a factual basis for those aspersions, and then claim that the judge must disqualify herself because the aspersions, *ex propio vigore*, create a cloud on her impartiality."); In re Bellsouth Corp., 334 F.3d 941 (11 th Cir. 2003) (rejecting practice of retaining particular counsel so as to create a conflict with the presiding judge); Wilksa v. Israel, 627 F.2d 32, 37 (7th Cir. 1980) (ruling that a party may not manufacture grounds for recusal by leveling "deliberate attack[s] on the trial judge.").

Consequently, deprived of the underlying innuendo and conjecture, and taken in their proper context, the meetings involving the Court and SAC Fraticelli, as well as the allegedly political comments made by the Court do not require the Court's recusal. They simply would not provide an objective individual informed of all the facts with a reasonable basis to doubt this Court's impartiality.

## B. First Circuit's Reversal of Ramirez-Rangel Rulings

Finally, the government makes the misleading and arguably unethical claim that "[t]he First Circuit has recently removed the Court from presiding over another public corruption case involving a defendant of the same political party as the Court and the defendants here." (Gov't Mot. at 2, Docket No. 200). The government directly cites the First Circuit's opinion in *Rivera-Rangel*, 396 F.3d 476 (1st Cir. 2005), in support of this

proposition.[38]   However, even the closest study of the First Circuit's opinion in *Rivera-Rangel* reveals no reference whatsoever to this judicial officer's political affiliation.   Much less does the Circuit even come close to intimating that political affiliation played any role in its decision to reverse this Court's rulings and remand the case to a different judge for sentencing. Consequently, citing the First Circuit's *Rivera-Rangel* opinion for the proposition the government does is nothing short of an attempt to mislead the Court and misrepresent the First Circuit's holding. That an attorney certifies with his signature that the contents of his pleadings and motions have a factual and legal basis need not be belabored. See, e.g., Fed. R. Civ. P. 11 (forbidding an attorney from negligently or intentionally misleading the court about the law). See, e.g., Thornton v. Wahl, 787 F.2d 1151, 1154 (7th Cir.), *cert. denied*, 479 U.S. 851 (1986). The Court would hate to think that, in its zeal to secure this judicial officer's recusal, the government has deemed it necessary to resort to misleading citations of a First Circuit opinion.[39] Aside from this misleading and strained citation of the First Circuit's *Rivera-Rangel* opinion, the government points to nothing more to substantiate its claim that the Court's alleged political affiliation has tainted these proceedings.

---

[38] The government prefixed its citation to the *Ramirez-Rangel* case with a "See" introductory signal. (Gov't Mot. at 2, Docket No. 200). According to *The Bluebook: A Uniform System of Citation*, Sixteenth Edition, "See" indicates that the "cited authority **directly** *states* or *clearly supports* the proposition" it follows.   (Emphasis supplied).

[39] Even more troubling is the decision of the Deputy Assistant Attorney General, the Public Integrity Section Chief, and the Appellate Section Chief to tolerate and participate in this troubling and sanctionable litigation practice by signing the government's motion. At the very least, their signature of a motion containing such a misrepresentation seems to run counter to the government's assurance that "[t]he United States Department of Justice does not file lightly a motion to recuse a sitting United States District Judge." (Gov't Mot. at 2, Docket No. 200).

As a separate matter, and as more fully explained in section IV, *supra*, it is difficult to overlook the untimeliness of the government's argument based on the meetings between the Court and SAC Fraticelli, as well as on the First Circuit's reversal of the Court's *Rivera-Rangel* rulings. For the sake of assiduousness, the Court has chosen to ignore the potential effects of this untimeliness on whether the government's reliance on its meetings with SAC Fraticelli should even be considered. However, such dilatory and selective argumentation goes far in suggesting that the government has used its recusal motion as a tactical weapon in response to unfavorable rulings, and in an attempt to find a judge more to their liking, a litigation strategy strenuously and consistently rejected by this and other Circuits.

In sum, the government has provided little more than insufficient innuendo about the Courts partiality due to political affiliation. However, much to the government's dismay, the First Circuit has explained quite pithily that "no permissible reading of subsection 455(a) would suggest that Congress intended to allow a litigant to compel disqualification simply on unfounded innuendo concerning the *possible* partiality of the presiding judge." El Fenix de Puerto Rico v. The M/Y Johanny, 36 F.3d 136, 140 (1st Cir. 1994). Consequently, this last ground offered by the government, like the others, is insufficient to warrant the Court's recusal.

## VIII. CONCLUSION

Seen through the undistorted prism of context and stripped of its sensationalistic rhetoric, the government's recusal motion is based on little more than a flimsy affidavit and unsupportable speculation. It plainly lacks the factual basis that would move an objective, fully informed observer to reasonably question this Court's impartiality. See

28 U.S.C. § 455(a). Just as a judge "must assiduously avoid participating in any proceeding in which his impartiality might reasonably be questioned, so too...must [he] avoid yielding in the face of unfounded insinuations." In re United States, 158 F.3d at 35 (internal citations omitted). As Judge Hector Laffitte recently highlighted on occasion of his retirement from active to senior judge, "[t]he law is the law and it must be upheld." "It is the business of judges to be indifferent to popularity." Chisom v. Roemer, 501 U.S. 380, 401, n.29 (1980) (internal quotations omitted). We "must strive to do what is legally right, all the more so when the result is not the one the 'home crowd' wants." Republican Party of Minnesota v. White, 536 U.S. 765, 806 (2002) (citing William Rehnquist, Dedicatory Address: Act Well Your Part: Therein All Honor Lies, 7 PEPP. L. REV. 227, 229-300 (1980). Consequently, and for the reasons set forth above, the government's recusal motions (Docket Nos. 197 and 200) are **DENIED**. Likewise, the government's motions to stay and terminate the Court's investigation into possible violations of Fed. R. Crim. P. 6(d) and (e) (Docket Nos. 198 and 200) are **DENIED**, and the same shall continue to the extent detailed in Section V(H) of this opinion.

**SO ORDERED.**

In San Juan, Puerto Rico, December 15, 2005.

S/JUAN M. PEREZ-GIMENEZ
U. S. DISTRICT JUDGE